**Nos. 17-3752, 18-1253, 19-1129, 19-1189**

# United States Court of Appeals for the Third Circuit

COMMONWEALTH OF PENNSYLVANIA, *et al.*,
*Plaintiffs-Appellees*,

v.

PRESIDENT, UNITED STATES OF AMERICA, *et al.*,
*Defendants-Appellants*,

and

LITTLE SISTERS OF THE POOR, SAINTS PETER AND PAUL HOME,
*Defendant-Intervenor-Appellant*.

On Appeal from the U.S District Court for the
Eastern District of Pennsylvania,
No. 2:17-cv-4540

**Reply Brief of Defendant-Intervenor-Appellant The Little Sisters of the Poor, Saints Peter and Paul Home**

NICHOLAS M. CENTRELLA
Conrad O'Brien PC
1500 Market Street, Suite 3900
Philadelphia, PA 19102-2100
(215) 864-8098
ncentrella@conradobrien.com

MARK L. RIENZI
LORI H. WINDHAM
ERIC C. RASSBACH
DIANA M. VERM
The Becket Fund for
Religious Liberty
1200 New Hampshire Ave. NW
Suite 700
Washington, DC 20036
(202) 955-0095
mrienzi@becketlaw.org

*Counsel for Defendant-Intervenor-Appellant*

## TABLE OF CONTENTS


Page

TABLE OF AUTHORITIES ........ iii

INTRODUCTION ........ 1

ARGUMENT ........ 4

I. The States have not met their burden on the merits ........ 4

A. The prior regulations violate RFRA. ........ 5

1. *The prior contraceptive mandate regulations violate RFRA* ........ 5

2. *The agencies have authority to regulate under RFRA* ........ 10

3. *The States' arguments defeat the relief they seek* ........ 17

B. The Final Rule does not violate the Establishment Clause ........ 19

C. The agencies have authority to regulate under the ACA ........ 20

D. The Fourth IFR and the Final Rule are not procedurally invalid under the APA. ........ 23

1. *The Fourth IFR had good cause* ........ 23

2. *The Final Rules are procedurally valid.* ........ 25

II. The States have not met their burden under the remaining preliminary injunction factors ........ 28

III. The States have not met their burden to show Article III Standing. ........ 29

A. The States are not injured by the Final Rule. ........ 29

B. The States cannot overcome their lack of injury-in-fact with *parens patriae* standing.......................... 32

C. The States have not shown that this Court can redress their claims...................................................... 34

IV. The Little Sisters have appellate standing................................... 35

CONCLUSION ........................................................................... 36

CERTIFICATE OF BAR MEMBERSHIP ............................................ 38

CERTIFICATE OF COMPLIANCE ...................................................... 39

CERTIFICATE OF SERVICE.................................................................. 40

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bindon v. Sebelius*,
No. 1:13-cv-01207 (D.D.C.) .............................................................. 31

*Burwell v. Hobby Lobby Stores, Inc.*,
573 U.S. 682 (2014) .............................................................. *passim*

*E. Tex. Baptist Univ. v. Sebelius*,
No. 4:12-cv-03009 (S.D. Tex.) .............................................................. 31

*Geneva Coll. v. Sec'y U.S. Dep't of Health & Human Servs.*,
778 F.3d 422 (3rd Cir. 2015) .............................................................. 6, 7, 9

*Hosanna-Tabor v. EEOC*,
565 U.S. 171 (2012) .............................................................. 19

*John Wyeth & Bro. Ltd. v. CIGNA Int'l Corp.*,
119 F.3d 1070 (3d Cir. 1997) .............................................................. 36

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992) .............................................................. 22, 29

*Massachusetts v. EPA*,
549 U.S. 497 (2007) .............................................................. 33

*McLaughlin v. Pernsley*,
876 F.2d 308 (3d Cir. 1989) .............................................................. 35

*Mitchell v. Robert DeMario Jewelry, Inc.*,
361 U.S. 288 (1960) .............................................................. 1

*NRDC v. EPA*,
683 F.2d 752 (3d Cir. 1982) .............................................................. 25

*Pennsylvania v. President*,
888 F.3d 52 (3d Cir. 2018) .............................................................. 35, 36

*Priests for Life v. U.S. Dep't of Health & Human Servs.*,
772 F.3d 229 (D.C. Cir. 2014) .......................................................... 23

*Sharon Steel Corp. v. EPA*,
597 F.2d 377 (3d Cir. 1979) .......................................................... 25

*Texas v. United States*,
809 F.3d 134 (5th Cir. 2015) .......................................................... 32

*Texas v. United States*,
86 F. Supp. 3d 591 (S.D. Tex. 2015) .......................................................... 34

*United States v. Cooper*,
750 F.3d 263 (3d Cir. 2014) .......................................................... 27

*United States v. Dimpfl*,
523 F. App'x 865 (3d Cir. 2013) .......................................................... 27

*United States v. Lane Labs-USA Inc.*,
427 F.3d 219 (3d Cir. 2005) .......................................................... 1

*United States v. Reynolds*,
710 F.3d 498 (3d Cir. 2013) .......................................................... 26-27

*United States v. Tann*,
577 F.3d 533 (3d Cir. 2009) .......................................................... 26

*Wheaton Coll. v. Burwell*,
134 S. Ct. 2806 (2014) .......................................................... 12

*Zubik v. Burwell*,
136 S. Ct. 1557 (2016) .......................................................... *passim*

**Constitutional Provisions**

U.S. Const. art. II § 3 .......................................................... 23

**Statutes**

5 U.S.C. § 706 .......................................................... 26

42 U.S.C. § 300gg-13 .......................................................... 18, 21

42 U.S.C. § 2000bb *et seq.* .......... *passim*

**Regulations**

14 C.F.R. § 1262.101 .......... 14

14 C.F.R. § 1262.103 .......... 14

42 C.F.R. § 54.3 .......... 14

42 C.F.R. § 54.5 .......... 14

42 C.F.R. § 59.2 .......... 32

49 C.F.R. § 6.5 .......... 14

72 Fed. Reg. 8,894 (Feb. 28, 2007) .......... 27

73 Fed. Reg. 38,030 (July 2, 2008) .......... 27

75 Fed. Reg. 81,849 (Dec. 29, 2010) .......... 27

76 Fed. Reg. 46,621 (Aug. 3, 2011) .......... 18

78 Fed. Reg. 39,870 (July 2, 2013) .......... 6

80 Fed. Reg. 41,328 (July 14, 2015) .......... 6

81 Fed. Reg. 91,494 (Dec. 16, 2016) .......... 15

82 Fed. Reg. 47,792 (Oct. 13, 2017) .......... 8, 23

83 Fed. Reg. 57,536 (Nov. 15, 2018) .......... 8, 30

84 Fed. Reg. 7,714 (Mar. 4, 2019) .......... 32

**Other Authorities**

Army Command Policy, Accommodating religious practices, Army Reg. 600-20 (Nov. 6, 2014) .......... 14

Bright Futures/American Academy of Pediatrics, Bright Futures Pocket Guide (2017), https://bit.ly/2OO2n8f .......... 21

Bright Futures/American Academy of Pediatrics, Recommendations for Preventive Pediatric Health Care (2019), https://www.aap.org/en-us/Documents/periodicity_schedule.pdf ............................................ 21

Fed. R. Civ. P. 65 ........................................................................ 8

*Application of the Religious Freedom Restoration Act to the Award of a Grant Pursuant to the Juvenile Justice & Delinquency Prevention Act*, 31 Op. O.L.C. 162 (2007) ...................... 15

*Women's Preventive Services Guidelines*, U.S. Department of Health & Human Services (Aug. 2011) https://www.hrsa.gov/womens-guidelines/index.html ....................... 18

## INTRODUCTION

If the States' brief shows one thing, it is that their entire lawsuit is based on willful blindness. The States tell the Court to examine the 2018 regulations, but to ignore the prior regulations re-imposed by the lower court's injunctions at the States' own request. According to the States, the Court can safely stick its head in the sand and leave the effects of its ruling for some future litigation.

But a court sitting in equity cannot turn a blind eye to the consequences of an injunction it issues. In fact, in fashioning equitable relief, courts are specifically charged with looking to the future to accord complete relief to the parties before it, according to the specific statutes at issue: "When Congress entrusts to an equity court the enforcement of prohibitions contained in a regulatory enactment, it must be taken to have acted cognizant of the historic power of equity to provide *complete relief* in light of the statutory purposes." *Mitchell v. Robert DeMario Jewelry, Inc.*, 361 U.S. 288, 291-92 (1960) (emphasis added). "The great principles of equity, securing complete justice, should not be yielded to light inferences, or doubtful construction." *United States v. Lane Labs-USA Inc.*, 427 F.3d 219, 224 (3d Cir. 2005) (quotation omitted).

Yet the States' lawsuit would accord far less than "complete justice" among the parties. Indeed, as their brief demonstrates, the States' lawsuit has a single, far narrower purpose: to reinstate the contraceptive mandate as it existed before the Fourth IFR. The States sought re-imposition of that regulatory system in each of the orders on appeal. The States base their entire RFRA defense on the validity of that system's "accommodation." States' Br. (SB) 77-83. And re-imposition of that system is the key to the States' claimed need for an injunction, both as to avoiding their own alleged fiscal harm, SB 35, and alleged irreparable harm to their citizens, SB 91.

The prior contraceptive mandate system is therefore this lawsuit's *raison d'être* and its linchpin. If that system cannot be re-imposed, invalidating the Final Rules gets the States nothing and all their arguments fail.

Yet in 100-plus pages, the States' brief demonstrates an aversion to defending the validity of the system they seek to impose. Indeed, even though the district court called this issue the "elephant in the room," Appx.736, the States repeatedly implore this Court not to think about whether that system is actually *legal*. They start by saying that this

Court does not *need* to resolve that system's legality. *See, e.g.*, SB 2-3. But by the end of the brief the States insist that "neither this Court nor the district court *can* adjudicate" the lawfulness of that system "and the States do not bear the burden of justifying its legality" at all. SB 82 (emphasis added).

The States' demand that the Court remain blind to this question is understandable, because each of the legal theories the States say invalidate the most recent Final Rules would also invalidate the prior system the States want reinstated. For example, the States insist that Congress only gave HRSA "the authority to determine *what* preventive services the Guidelines cover" but no "authority to determine *who* need not provide those services." SB 67. But the States now ask this Court to impose a system that includes both an exemption and "accommodation" which purport to address "who" must comply. SB 63. Likewise, the States insist that RFRA allows agencies to grant only plaintiff-by-plaintiff relief ordered by courts in particular cases. SB 80. But then the States ask the Court to reinstate a version of the mandate with group-wide exemptions expressly created to comply with RFRA in the wake of *Hobby Lobby*.

What becomes clear by page 104 is that the States can muster no coherent legal theory that would justify the thus-far-but-no-further relief they seek—reinstatement of the prior mandate regulations. And that is no surprise given that dozens of courts have already found those rules illegal, and even the previous Administration walked away from its key legal arguments three years ago. Tellingly, the States do not even try to rebut or rehabilitate the prior Administration's concessions in *Zubik*—they just whistle past the mandate's graveyard.

This Court has no such luxury, and neither did the federal government. When a proper understanding of the ACA, APA, and RFRA are applied—or even if the States' incorrect understanding of these laws could be applied consistently—there is only one permissible result: reversal of the district court's orders.

## ARGUMENT

### I. The States have not met their burden on the merits.

The district court found, and the States do not dispute, that RFRA lies at the heart of this case. If the regulatory system that existed before the Fourth IFR violated federal civil rights law, then of course the federal government was obligated to change it. Appx.37 ("any exception to

the ACA required by RFRA is permissible"). But the States' lengthy brief mounts only a half-hearted and logically incoherent defense of the prior system as compliant with RFRA. The States have to rely on vacated cases, ignore dozens of live injunctions, and ignore controlling concessions to argue that dozens of courts were wrong to enjoin the prior regulations as an illegal burden on religious exercise. They ground this argument in a bizarre claim that federal agencies cannot act to cease illegally burdening religion—a view of RFRA the States cannot even maintain for an entire brief. *Compare* SB 72-73 *with* SB 77, 82. But the Court cannot uphold an injunction premised on believing "as many as six impossible things before breakfast." The errors and logical inconsistencies of the States' position require reversal.

## A. The prior regulations violate RFRA.

### *1. The prior contraceptive mandate regulations violate RFRA.*

The Little Sisters' opening brief demonstrated that the "accommodation" the States wish to resurrect is illegal. Br. 46-54. First, the Supreme Court ruled in *Hobby Lobby* that the government cannot force religious employers to provide health plans that include contraceptive coverage that violates their religious beliefs. *Burwell v. Hobby Lobby*

*Stores, Inc.*, 573 U.S. 682, 736 (2014). Second, the agencies' concessions in *Zubik v. Burwell* doomed their case. Br. 19-20.[1]

In response, the States completely ignore the concessions from *Zubik*. Instead, the States forge right ahead and make the federal government's since-discredited 2015 argument that the "accommodation" suffices to distinguish *Hobby Lobby*. But the States can rely solely on *vacated* cases to make their point. *See* SB 79 (citing *Geneva Coll. v. Sec'y U.S. Dep't of Health & Human Servs.*, 778 F.3d 422, 435-42 (3rd Cir. 2015), *vacated sub nom. Zubik v. Burwell*, 136 S. Ct. 1557 (2016)). Like the States' arguments here, those outdated and now-vacated decisions depended on the accommodation to save the mandate from RFRA. But if the accommodation is invalid, the States' only argument for distinguish-

[1] The agencies' concessions at the Supreme Court were hardly surprising because, as the religious objectors explained in *Zubik*, the government's arguments about the accommodation were contrary to the plain text of the regulations. The regulations themselves showed that the accommodation relies on religious objectors and their "insurance coverage network" to achieve the mandate's coverage goal, 78 Fed. Reg. 39,870, 39,876 (July 2, 2013), such that "plan participants and beneficiaries (and their health care providers) do not have to have two separate health insurance policies (that is, the group health insurance policy and the individual contraceptive coverage policy)." 80 Fed. Reg. 41,328 (July 14, 2015); *see also* Brief for Petitioners at 18-19, 47, *Zubik v. Burwell*, 136 S. Ct. 1557 (2016) (No. 14-1418).

ing *Hobby Lobby* goes with it. The agencies' *Zubik* concessions defeat the States' substantial burden arguments because their arguments are premised upon the idea that religious objectors play "no role whatsoever" in the provision of contraceptive coverage. SB 79 (quoting *Geneva Coll.*, 778 F.3d at 435-42). As the previous Administration was forced to concede, their role was actually quite significant.

The Little Sisters have also pointed out that the agencies never explained why the accommodation was necessary for some religious employers but not others—religious or not—who were wholly exempted. Br. 65. In order to explain the discrepancy, the agencies conceded in *Zubik* that women have many other avenues to obtain coverage. Br. 49-50.[2] In light of these concessions, the Supreme Court directed the agencies to arrive at an alternative, vacating the decisions of the appellate courts in the process. *See Zubik v. Burwell*, 136 S. Ct. 1557, 1560 (2016).

---

[2] Nor should this Court credit the States' claims about the "compelling" need for this particular type of contraceptive mandate—which neither of the States has bothered to implement for itself. Br. 49.

That is why the Fourth IFR (and Final Rule) devoted nearly 8,000 words to explaining why the agencies changed course after their concessions and the Supreme Court's directive. 82 Fed. Reg. 47,792, 47,799-807 (Oct. 13, 2017); 83 Fed. Reg. 57,536 (Nov. 15, 2018).[3] It is also why the agencies were not able to oppose—and why Article III judges chose to grant—injunctions against the mandate following *Zubik*. Br. 6-11, 24.[4] The States fail to reckon with any of these points, or with the fact that the panel decision upholding the "accommodation" in *Geneva College* was not even law of the case in that particular case on remand, much less law of the Circuit. Br. 52.

But even if the States' accommodation-based RFRA argument could be salvaged, it would still run headlong into the States' own ACA argu-

---

[3] Yet the States repeat the baseless claim that the government failed to explain its reasoning. SB 83. Even the district court rejected that assertion. Appx.84-85.

[4] In an attempt to rehabilitate the government's straight-loss record in RFRA challenges to the accommodation after *Zubik*, the States assert that the agencies surrendered, and federal courts issued injunctions without an Article III case or controversy. SB 80 & n.34. If that were true, then the federal courts issuing injunctions would have been acting in excess of their jurisdiction and violating Rule 65, which requires that "[e]very order granting an injunction and every restraining order must . . . state the reasons why it issued, . . . ." Fed. R. Civ. P. 65.

ment. The States claim that the accommodation is permissible because religious objectors "play 'no role.'" SB 79 (quoting *Geneva Coll.*, 778 F.3d at 435-42). At the same time, they claim that "the authority to determine *what* preventive services the Guidelines cover does not give HRSA authority to determine *who* need not provide those services." SB 67. Both of these claims cannot be true at the same time.

On one hand, if the accommodation is a true exemption, then (according to the States) the agencies lacked the authority to create it. SB 63. In that circumstance, this Court certainly could not re-impose the accommodation and the States' RFRA argument (which is based exclusively on the accommodation, SB 79-80) must fail. On the other hand, if the accommodation *is* permissible (under the States' view of the ACA) because it is not a true exemption—that is, if it does not dictate "who" must comply—then the States lose under RFRA, because the accommodation burdens religious employers like the Little Sisters, who are *not*

exempt from the obligation to provide contraceptive services.[5] In that circumstance *Hobby Lobby* squarely controls and the States lose.

In short, the States' ACA and RFRA arguments are hopelessly at war with each other; and regardless of which one the Court might credit, the States must lose their case.

### *2. The agencies have authority to regulate under RFRA.*

As the Little Sisters explained in their opening brief, RFRA's plain text applies to regulations. Br. 55. Indeed, the statute begins not with a remedy, but a prohibition: the "Government ***shall not***." 42 U.S.C. § 2000bb-1 (emphasis added).

In response, the States argue that RFRA is purely a case-by-case judicial remedy and the federal government has no power to resolve RFRA violations by restraining its own conduct. SB 75-76. The States claim RFRA "simply means that any person has a private right of action against any agency for a purported violation of RFRA." SB 76. Under

---

[5] And according to the States, RFRA cannot help the agencies out of this bind, since "any determination that the accommodation violated RFRA would extend no further than the plaintiff in that case." SB 80; *but see* SB 82 ("the accommodation is now mandated by RFRA").

the States' reading, the government must wait to get sued and submit to injunctions each time a new religious objector comes forward, with no power to comply with RFRA by ceasing the illegal activity on its own. *See* SB 73. That bizarre view cannot be reconciled with the plain text of RFRA, which states that "[g]overnment *shall not* substantially burden a person's exercise of religion." 42 U.S.C. § 2000bb-1 (emphasis added).

The States' argument also cannot be reconciled with *Hobby Lobby* and *Zubik*. In *Hobby Lobby*, the Supreme Court held that "RFRA *surely allows*" the "modification of an existing program," and might even require "the 'creation of an entirely new program'" in order for the government to comply. 573 U.S. at 729-30 (2014) (emphasis added). The agencies argued that RFRA could not protect Hobby Lobby because doing so might compel the creation of a new government program. *Id.* The Supreme Court squarely rejected that argument. *Id.*[6]

---

[6] This discussion also illustrates why the Plaintiffs' claim that "the accommodation complied with RFRA under the facts of that case," is wrong. SB 77. Hobby Lobby had not raised any religious objection to the accommodation, which had not been offered to it. 573 U.S. at 730-31. The existence of the accommodation proved that a less restrictive alternative existed. *Id.* It did not prove that the accommodation was suitable for all purposes, much less that RFRA never authorizes regulatory

The Court also explained that "the most straightforward way" of alleviating the RFRA violation "would be for the Government to assume the cost of providing the four contraceptives at issue to *any women* who are unable to obtain them under their health-insurance policies . . . and HHS has not shown, *see* § 2000bb-1(b)(2), that this is not a viable alternative." *Hobby Lobby*, 573 U.S. at 728 (emphasis added). The Supreme Court thus not only contemplated that the agencies could enact a broad regulatory change to bring the mandate into compliance with RFRA, it criticized the government for failing to prove that it could not make such a change, not just for Hobby Lobby's employees, but for "*any women*" in the same situation. The States' crabbed version of RFRA, in which a one-party judicial injunction is the *only* remedy, cannot be squared with *Hobby Lobby*. *See* 573 U.S. at 736 ("The contraceptive mandate, as applied to closely held corporations, violates RFRA").[7]

---

change, which is why the Court specifically reserved that issue. *Id.* at 731. Indeed, just three days after *Hobby Lobby*, the Supreme Court granted emergency relief for Wheaton College, which was challenging the accommodation. *Wheaton Coll. v. Burwell*, 134 S. Ct. 2806, 2807 (2014).

[7] The States claim that "*Hobby Lobby* explicitly rejected the use of blanket exemptions." SB 78 (citing 573 U.S. at 719 n.30). The cited

Nor can it be squared with *Zubik*. In *Zubik*, the unanimous eight-member Court noted that the "Government has confirmed that the challenged procedures 'for employers with insured plans could be modified,'" *Zubik*, 136 S. Ct. at 1560 (citation omitted), and then directed the government to "[a]rrive at an approach going forward" resolving the dispute. *Id.* The Court declined to decide "whether the current regulations are the least restrictive means" of furthering the government's interest. *Id.* The Court's directive to find an alternative approach, its reference to the "current" regulations, and its confirmation that the procedures can be modified can only be understood to contemplate—if not demand—that the government amend its regulations to resolve the RFRA problem. Thus the Supreme Court has twice stated, with regard to this very regulation, that the government must (or at least may) amend its regulations to comply with RFRA.

---

footnote actually undercuts the States' argument. *Hobby Lobby* noted that the 'meager legislative history' regarding a failed conscience amendment did not justify the conclusion that other protections were precluded. 573 U.S. at 719 n.30. Further, the Court specifically contemplated broad solutions as a means of responding to objections. *See* 573 U.S. at 728-30.

Longstanding practice also supports this view. RFRA appears in more than 20 different CFR provisions and dozens of federal directives, agency decisions, and guidance documents. Since the passage of RFRA, every administration has taken agency action relying upon RFRA. This includes rules for agency adjudication of RFRA disputes under President Clinton,[8] charitable choice regulations under President Bush,[9] regulations governing religious accommodations in the armed forces under President Obama,[10] and the current regulations under President Trump.

Agencies have repeatedly considered RFRA claims and taken official action to accommodate religious concerns, including granting permits

---

[8] *See* 14 C.F.R. § 1262.103(a)(4) (providing for NASA adjudication of RFRA disputes); 14 C.F.R. § 1262.101(b)(iv) (providing for attorneys' fees in such adjudications); 49 C.F.R. § 6.5 (providing for attorneys' fees in Department of Transportation adjudications under RFRA).

[9] *See, e.g.*, 42 C.F.R. § 54.3 (provision on nondiscrimination against religious organizations receiving certain funding); 42 C.F.R. § 54.5 (guaranteeing independence of religious organizations receiving certain funding).

[10] *See* Army Command Policy, Accommodating religious practices, Army Reg. 600-20 ch. 5-6 (Nov. 6, 2014) (prescribing religious accommodations under RFRA).

for Native Americans to kill a limited number of golden eagles (2016)[11] and exempting a religious grant recipient from a federal statute (2007).[12] Accordingly, agencies have the authority under RFRA to head off problems before they get to court, including through preventive rules allowing agency adjudications of RFRA disputes or guidance provided for future accommodations.[13]

The States' approach would also perversely turn RFRA into a one-way ratchet *decreasing* religious liberty protection. If "it is the courts, not the Agencies, that determine RFRA's reach," Appx.101, then an

---

[11] *Eagle Permits; Revisions to Regulations for Eagle Incidental Take and Take of Eagle Nests*, 81 Fed. Reg. 91,494-501 (Dec. 16, 2016) ("It is also important to recognize that the Hopi take of golden eagles . . . is a protected activity under the Religious Freedom Restoration Act (42 U.S.C. 2000bb *et seq.*)").

[12] *Application of the Religious Freedom Restoration Act to the Award of a Grant Pursuant to the Juvenile Justice & Delinquency Prevention Act*, 31 Op. O.L.C. 162 (2007).

[13] The States also suggest in a footnote that preventive agency action "would be establishing both what constituted private religious exercise and what substantially burdened that exercise." SB 76 n.32. But the government does not violate the Establishment Clause simply because it attempts to lift a burden on religious exercise. Br. 57. And here, it is private parties and dozens of courts which have told the agencies both via litigation and comments on proposed rules exactly what the religious exercise is and what they ought to do to eliminate illegal burdens.

agency's authority to provide religious accommodations can safely go no farther than whatever district court decision is *least* protective of religious liberty. Otherwise a rule may be vacated or enjoined nationwide, even where (as here) there are dozens of injunctions that say a religious exemption is required by RFRA. *See* Br. 6-11. That allows one district court decision to restrict RFRA for the entire country. And it forces agencies to guess each judicial determination of RFRA with laserlike clairvoyance.

Here, the agencies did not have to guess. When agencies are faced with diverging judicial decisions on RFRA's application to a federal regulation, they necessarily have the discretion to change their conduct and err on the side of protecting religious liberty. The States' argument that RFRA is a mere cause of action, if accepted, would deny that space to govern and balance competing interests by conforming the federal government's conduct to RFRA's commands. SB 75-76. That is contrary to the statutory text of RFRA, longstanding agency practice, and the decisions of the Supreme Court.

### *3. The States' arguments defeat the relief they seek.*

The Little Sisters demonstrated in their opening brief that all prior versions of the contraceptive mandate regulations included a religious exemption. Br. 15-19. Thus if the States were correct that the agencies lack the "authority to determine *who* need not provide those services," SB 67, then all prior versions of the mandate regulations must be invalid, too. Br. 38-39. In response, the States' primary argument is that the Court should simply pay no attention to the regulations behind the curtain. SB 67-68 ("Because the States have not challenged the church exemption, neither this Court nor the district court can adjudicate its lawfulness. Nor is it the burden of the States to justify the existence of separate and unrelated regulations."); SB 6 ("All cases except the first two challenge prior rules not before this Court."); SB 2-3 ("It is not necessary to resolve all of the difficult questions").

But the remedy the States seek is necessarily part of the States' case. That is especially true here, where the States invoke the Court's equitable powers and seek injunctive relief, and where the States' request is premised upon prior regulatory action, not the ACA itself. The States' argument—indeed, the entire basis for their purported standing in this

case—is that women need contraceptive coverage. The problem with this claim is that contraceptive coverage was never mandated by the ACA; it originated with HHS regulations and an agency website. *See* 42 U.S.C. § 300gg-13(4) (delegating authority to HRSA); HRSA, *Women's Preventive Services Guidelines*, U.S. Department of Health & Human Services (Aug. 2011) https://www.hrsa.gov/womens-guidelines/index.html (list of preventive services). So in order for the States to receive the relief they seek, they need the Court not only to invalidate the current regulations, but also to reinstate some prior version of the regulations which require contraceptive coverage. Without that reinstatement—whether express or implied—nothing guarantees the forced employer-provided contraceptive coverage the States seek.

The States claim uncertainty as to the source of the exemption for churches, identifying both a grant of discretion to HRSA (which they say is invalid) and reliance upon the ministerial exception as possibilities. SB 68-70. But the source of authority for the church exemption is no mystery; it was explained in the Federal Register. *See* 76 Fed. Reg. 46,621, 46,623 (Aug. 3, 2011). It was, as the States suggest, based upon the agencies' discretion to regulate under the ACA, as well as the pro-

tection granted to churches under the First Amendment. *Id.*; *see Hosanna-Tabor v. EEOC*, 565 U.S. 171 (2012).

The States, like the district court, simply ignore the Little Sisters' argument that the ministerial exception could not provide the source for the church exemption, since (1) the ministerial exception extends to religious orders like the Little Sisters and others who were not previously exempt, and (2) the ministerial exception is limited to *ministerial* employees and does not function as a blanket exemption for all church employees. Br. 65. As the States acknowledge, if the agencies had no authority to decide who must be covered, then they had no discretion to allow HRSA to create an exception. SB 68-69. Thus, if this Court holds that the States are right and the agencies have no power to create exemptions, then the church exemption is simply invalid. The States can therefore win only a Pyrrhic victory: a ruling which invalidates the prior regulations they ask to re-impose.

**B. The Final Rule does not violate the Establishment Clause.**

The Little Sisters also argued in their opening brief that the Final Rule does not violate the Establishment Clause. Br. 56-59. The States' response is to expressly decline to respond, claiming that the Estab-

lishment Clause was not briefed below. SB 48-49 n.20. But Pennsylvania *itself* argued that the Fourth IFR was an Establishment Clause violation in its first motion for a preliminary injunction, and that injunction is on appeal here. Dkt.8-2 at 34-37. The States incorporated their Establishment Clause argument in their motion to enjoin the Final Rule as well. Dkt.91-2 at 11 n.15. The issue thus remains live in this appeal.

Furthermore, RFRA itself invokes the Establishment Clause as the outer limit of permissible exemptions. 42 U.S.C. § 2000bb-4; Br. 56. The States also fail to respond to this argument, but since the district court ruled that the Final Rule exceeds the bounds of RFRA, Appx.52, it is proper for this Court to determine whether the Final Rule is permitted under the Establishment Clause, and thus RFRA.

**C. The agencies have authority to regulate under the ACA.**

In their opening brief, the Little Sisters demonstrated that the agencies have discretion under the ACA to enact the Final Rule. Br. 41-45.

The States' arguments to the contrary fail. First, the States fail to make their case that the government has no leeway under the ACA to determine *who* must provide coverage. The States dismiss in a footnote

the Little Sisters' argument that the statutory term "guidelines" means what it says and allows the agencies to create a framework that balances competing interests. *See* Br. 43; SB 63 n.25. The States argue that the use of the term "guidelines" in connection with children's preventive care, 42 U.S.C. § 300gg-13(a)(3), shows that "guidelines" refers only to a list of services. *Id.* Not so. The guidelines at issue there do not, as the States would have it, "simply define a list" of covered services. SB 63 n.25 (citation omitted). Instead, they provide a variety of age- and individual-circumstance-based recommendations which note that "variations, taking into account individual circumstances, may be appropriate," and "[recommended procedures] may be modified, depending on entry point into schedule and individual need."[14] They are accompanied by a 134-page "pocket guide" to aid practitioners in carrying out the recommendations.[15]

---

[14] Bright Futures/American Academy of Pediatrics, Recommendations for Preventive Pediatric Health Care (2019), https://www.aap.org/en-us/Documents/periodicity_schedule.pdf.

[15] *See* Bright Futures/American Academy of Pediatrics, Bright Futures Pocket Guide (2017), https://bit.ly/2OO2n8f.

Moreover, the States make no response to the Little Sisters' argument that HHS has long understood the statute to permit it to make alterations. Br. 44-45. The regulatory history indicates just what the statutory text does: that Congress delegated to HRSA authority to create a comprehensive framework, and HRSA did so by creating a complex series of guidelines that balances competing interests.

Finally, the States claim that the religious exemptions violate the Take Care Clause unless "HRSA modifies the Guidelines, or the Judiciary concludes that the government lacks a compelling government interest in enforcing the contraceptive mandate." SB 87-88. In the first instance, it is unclear how the Take Care Clause obliges the executive to enforce past executive *guidance*—here, the Guidelines—as opposed to a statute. The Take Care Clause says nothing regarding how or when the President may modify the regulatory approach by which "the Laws be faithfully executed," U.S. Const. art. II § 3. Indeed, if anything, the Constitution *forbids* the courts from transferring "the Chief Executive's most important constitutional duty" to themselves. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 577 (1992).

HRSA, of course, is part of HHS, so it is particularly strange to assert that the agencies are failing to "take care" to enforce guidelines they created and can unilaterally modify at any time. Moreover, the executive branch also has a duty to "take care" that federal regulations comply with RFRA, which is no less a duly-enacted law than the ACA.

### D. The Fourth IFR and the Final Rule are not procedurally invalid under the APA.

#### *1. The Fourth IFR had good cause.*

As the Little Sisters showed in the opening brief, Br. at 60-64, the agencies correctly concluded that the mandate infringed civil rights and a broader exemption was necessary "to cure such violations." *See* 82 Fed. Reg. at 47,814. Indeed more than 50 courts expressly told the agencies that their regulations violated RFRA. Br. 6-11. As in *Priests for Life v. U.S. Department of Health & Human Services*, the government was "obligat[ed]" to "alleviate any burden on religious liberty" by IFR. 772 F.3d 229, 276 (D.C. Cir. 2014).

The States argue in response that the Fourth IFR lacked good cause since "entities that are not protected by injunctions either did not challenge the mandate in the years since it was created in court or challenged it and lost." SB 55. That contention denies reality.

To begin with, the States defend the prior IFRs by invoking *Priests for Life*, which upheld the Third IFR that was issued after the Supreme Court's order in *Wheaton College*. SB 60 n.24.[16] But if the agencies had good cause to bypass notice and comment to "alleviate" RFRA violations for a broad group of religious objectors after *Wheaton College*, that justification can only be stronger after the agencies conceded that the accommodation depends on contraceptives being delivered "in the one insurance package." Tr. of Oral Arg. at 60-61, *Zubik v. Burwell*, 136 S. Ct. 1557 (2016) (No. 14-1418).

Once *Zubik* vacated the circuit court decisions rejecting RFRA claims against the mandate, many religious entities again had live, meritorious RFRA claims that the agencies could reasonably decide to alleviate by IFR. The States are therefore mistaken that the agencies did not need to resolve claims brought by challengers who lost in previous stages of litigation. SB 55. Nor have the States pointed to any authority suggesting that the federal government is free to violate RFRA unless and until each particular claimant sues. As explained in the Little Sis-

[16] The States nowhere explain why RFRA allowed a broad, non-plaintiff-specific rule change in the Third IFR. *Contra* SB 71-72.

ters' opening brief, ongoing civil rights violations are contrary to the public interest and here constituted good cause. Br. 63-64.

### *2. The Final Rules are procedurally valid.*

As the Little Sisters established in the opening brief, agencies do not need to start over with a notice of proposed rulemaking (NPRM) if they mistakenly issue an IFR that is later held to lack good cause. Br. 66-74. In particular, the Little Sisters explained that *Sharon Steel Corp. v. EPA*—a case on which the States rely, SB 56, 57—not only permitted but *ordered* an agency to remedy a procedurally invalid rule by providing the type of notice and comment opportunity that has already been provided here. Br. 68-69 (citing 597 F.2d 377, 381-82 (3d Cir. 1979)).

The States fail to respond with any contrary reading of *Sharon Steel*. Instead, they claim that whenever an IFR turns out to lack good cause, the agencies must "revok[e]" that rule and then "issu[e] an NPRM asking the public to comment on *proposed*" rules. SB 59.

The States' only support for this claim is an overreading of *NRDC v. EPA*, 683 F.2d 752 (3d Cir. 1982) as categorically prohibiting what *Sharon Steel* mandated. That can't be right—especially since *NRDC* relies on *Sharon Steel*. 683 F.2d at 765-68. *NRDC* simply says that postprom-

ulgation notice and comment "cannot cure" a procedurally invalid IFR. *NRDC* went on to invalidate the finalized rule because EPA asked in its final rule whether a postponement should be continued, which did not cure the prior lack of consideration of whether the postponement should have occurred in the first place. Here, the Final Rule did not simply ask whether the Fourth IFR should continue, but considered and gave responses as to why the substance of the rule was created in the first place. Furthermore, as explained in the Little Sisters' opening brief, Br. 69-70, *NRDC* is distinguishable because here the agencies used the same administrative procedures to modify the regulations that had been used to put them in place (*i.e.*, IFRs), and because the Fourth IFR and Final Rule did not revoke the prior regulations for most employers. The States offer no rebuttal.[17]

The States' position also ignores that not all violations of the APA are "prejudicial error." 5 U.S.C. § 706. For example, *United States v.*

---

[17] Even if *NRDC* were read broadly to conflict with *Sharon Steel*, then *Sharon Steel* would govern as the earlier decision. *See United States v. Tann*, 577 F.3d 533, 540 (3d Cir. 2009) ("[I]f our cases conflict, then the earlier is the controlling authority and the latter is ineffective as precedent.") (internal quotation marks and citations omitted).

*Reynolds*, another case on which the States rely, SB 56, merely held that postpromulgation notice and comment does not cure prejudice when a person is criminally convicted of violating an invalid IFR; nowhere does the Court suggest that a defective IFR fatally infects the final rule. 710 F.3d 498, 519 (3d Cir. 2013). Indeed, the IFR invalidated in *Reynolds*, 72 Fed. Reg. 8,894, 8,897 (Feb. 28, 2007), had already been superseded by a final rule issued while the IFR was still in effect. *See* 73 Fed. Reg. 38,030, 38,046-47 (July 2, 2008) (promulgating through notice and comment the "SMART" guidelines that reaffirmed the interim rule applying SORNA retroactively); 75 Fed. Reg. 81,849 (Dec. 29, 2010) (finalizing the interim retroactivity rule). Those final rules form the basis of countless criminal judgments in this Circuit. *See, e.g.*, *United States v. Cooper*, 750 F.3d 263, 265 (3d Cir. 2014) (affirming the Attorney General's authority to issue the SMART guidelines); *United States v. Dimpfl*, 523 F. App'x 865, 866 (3d Cir. 2013). *Sharon Steel* and *Reynolds* demonstrate that an allegedly defective IFR does not cause prejudicial error in a subsequent rule issued after taking comments.

## II. The States have not met their burden under the remaining preliminary injunction factors.

Beyond the States' inability to demonstrate a likelihood of success on the merits, they have also failed to carry their burden as to the other injunction factors. In light of the existing injunctions, the States have failed to show irreparable harm, given that they cannot identify even a single employer expected to change (or employee expected to lose) coverage based on these rules. They offer no response to the Little Sisters' argument that the States have no evidence of harm even from the much larger exemptions have existed for years. Br. 32-34. The States simply have not shown that the Final Rule will add anything to their alleged burdens.

The balance of the equities also requires reversal of the district court's orders. While the States cannot find a single actual person who will be harmed by the Final Rule, there are actual, real, known religious groups for whom the Final Rule brings the real benefit of codifying judicially-obtained protection. It would be far from equitable to allow the States, who sat on the sidelines for years while religious groups won protection in court, to collaterally attack that relief here. The public interest—both in the enforcement of federal civil rights laws and the

orderly functioning of the federal judiciary—thus forecloses the injunction.

## III. The States have not met their burden to show Article III standing.

### A. The States are not injured by the Final Rule.

As the Little Sisters pointed out in the opening brief, the States have no standing because they have not been able to show that they are injured by the Final Rule. Br. 31-36.

In over 100 pages of briefing in response, the States point to *no record evidence* that they or anyone else will be harmed by the Final Rule, and have thus not met their burden to establish standing to bring this lawsuit.[18] The States' only allegations of injury from the Final Rule are "conjectural or hypothetical." *Lujan*, 504 U.S. at 560 (citation and quotation marks omitted). Rather than provide evidence that any women will lose contraceptive coverage as a result of the Final Rule, and that those women would pass any resulting harm onto the States, *see* Br. 31-

---

[18] The States entirely ignore the argument that they have no standing to bring several of the claims they pursued in their first preliminary injunction motion, which is still at issue on this appeal. *See* Dkt. 8-2 at 28-37; Br. 30.

34, the States mock as "absurd" the notion that they won't bear costs as a result of the Final Rule. But the burden is theirs to show that harm will result to them from the Final Rule, and they have not done so.

Indeed, the States do nothing to respond to the claim that they rely for standing on a string of speculative hypotheticals as presented in the Little Sisters' opening brief. Br. 32-34. They instead blame the defendant agencies for not providing in the Final Rule the number of employers who will drop coverage. SB 41. But any attempt to rely on the agencies' estimates must account for the fact that the Final Rule applies to employers who already have injunctions. Employees working for those employers would not create any additional burden on the States, because any additional cost (if any such costs actually existed) would have occurred prior to the Final Rule and prior to the States' injunction. For example, the agencies included in their estimate employers who litigated but who did not achieve permanent injunctions between the IFRs and the Final Rules. 83 Fed. Reg. at 57,575-76. That does not take into account the fact that almost all of the litigating employers had injunctions in place before the IFRs were published. *See, e.g.*, Order, *E. Tex. Baptist Univ. v. Sebelius*, No. 4:12-cv-03009 (S.D. Tex. Dec. 27, 2013),

ECF No. 134; Order, *Bindon v. Sebelius*, No. 1:13-cv-01207 (D.D.C. Aug. 14, 2013), ECF No. 19. The States also counted women working for employers who made use of the accommodation. SB 41-42. But they provide no evidence that employers who were satisfied with the accommodation will take advantage of the exemption.

Instead of showing that the Final Rules will cause any changes if the district court's preliminary injunctions are lifted, the States describe the *status quo ante*—in which all known religious objectors already have injunctions, and in which many times more employers are exempt for other reasons—as the system that this Court should keep in place. SB 82. But that *status quo ante* is rife with exemptions, Br. 32, and the States have made no attempt to show that the prior exemptions and injunctions have cost them one dollar since the APA was implemented in 2012. Without any evidence of harm from larger, longer-lasting exemptions, there is no reason to believe the Final Rule will cost them a dollar now.

The also States claim it is "inevitabl[e]" that women who lose contraceptive coverage as a result of the Final Rule will seek them elsewhere. SB 1. They also admit that "both states have networks of state-funded

Title X clinics, which serve patients at every income level." SB 38. If both propositions are true, then there is no reason to suppose that any women who do lose coverage as a result of the Final Rule will be left without contraceptives, belying their claim of harm to "residents' well-being." SB 35.[19]

### B. The States cannot overcome their lack of injury-in-fact with *parens patriae* standing.

As the Little Sisters explained in the opening brief, Br. 35-36, the States cannot claim *parens patriae* standing to address a non-existent injury. *See Texas v. United States*, 809 F.3d 134, 155 (5th Cir. 2015) (*parens patriae* analysis included finding of injury for the state itself).

---

[19] The Administration's recent expansion of Title X makes the States' injury still less likely. For decades, Title X has authorized project directors to provide family planning services to women whose incomes exceed the poverty line if there are "good reasons" to conclude they are unable to pay for the services. 42 C.F.R. § 59.2. HHS expanded the "good reasons" determination so that project directors can consider a woman's loss of contraceptive coverage due to her employer's sincere religious objection as an "insurance coverage status" factor that can be cited as "good reason" for eligibility. 84 Fed. Reg. 7,714, 7,734 (Mar. 4, 2019). The project director has discretion to determine whether "good reasons" exist, which is why *amicus* Planned Parenthood is mistaken to speculate that the Title X expansion will result in overstretch. *See* Planned Parenthood Br. at 10; *cf.* 84 Fed. Reg. at 7,738-39 (answering the funding objection to expanding Title X).

Even assuming an injury, however, the States ignore the Little Sisters' argument that they cannot bring a suit to "protect [their] citizens from the operation of" RFRA. *Massachusetts v. EPA*, 549 U.S. 497, 520 n.17 (2007) (citation omitted); Br. 35. They instead try to reframe their claims as "seek[ing] only to ensure that a federal agency complies with a duly-enacted law of Congress." SB 47. But this twist of logic displays the problem with their reasoning: they claim a quasi-sovereign interest in representing the interests of *some* of their residents under HRSA's website guidelines only by pitting them against other residents with religious objections protected by federal statute. If States have a quasi-sovereign interest in choosing sides against the federal government in that conflict, then they have a quasi-sovereign interest in everything.

Not only does the States' argument create an unnecessary conflict between their residents, but it raises the question of how a state can have a quasi-sovereign interest on behalf of some of its citizens in a conflict with other citizens over an interpretation of federal law. Indeed, in *Massachusetts v. EPA*, the Supreme Court defined "quasi-sovereign interests" as "public or governmental interests that concern the state as a whole." 549 U.S. at 520 n.17. Here, where the States have not been able

to show that there are *any* citizens who fall into the subset of women whose employers will drop contraceptive coverage as a result of the Final Rules, there can hardly be a "quasi-sovereign interest" that "concern[s] the state as a whole" in championing those (as-yet unknown) citizens against the state's religious objectors.

### C. The States have not shown that this Court can redress their claims.

The States fail to respond at all to the Little Sisters' argument that an order from this Court will not help them if religious employers can find protection in other ways, or if the agencies could eliminate the HRSA contraceptive requirement altogether.[20] Br. 37-38. Regarding the redressability problem that the legal regime they ask this court to reinstate is illegal, they claim only that the legality of the underlying re-

[20] The States respond only in a footnote to the argument that any harm they experience as a result of the Final Rule would be self-inflicted. SB 43 n.17. And they cite only a district court opinion suggesting that they face "two options: full compliance with a challenged action or a drastic restructure of a state program." *Texas v. United States*, 86 F. Supp. 3d 591, 619 (S.D. Tex. 2015). But that ignores the Little Sisters' argument that the States will not have to "compl[y]" with anything; any subsidies they provide for contraceptives are voluntary. Nor do they make a case that "a drastic restructure" is necessary to continue providing those optional subsidies. SB 43 n.17.

gime is not before this Court, at the same time they ask courts to reinstate it. *See supra* Part I.A.3.

**IV. The Little Sisters have appellate standing.**

The States argue in the last two pages of their brief that the Little Sisters do not have appellate standing. SB 102-03. This argument is confused.

*McLaughlin* and the States' other cited cases stand only for the unremarkable proposition that "[a]n intervenor's right to continue a suit *in the absence of the party on whose side the intervention was permitted* is contingent upon a showing . . . that he fulfills the requirements of Article III." *McLaughlin v. Pernsley*, 876 F.2d 308, 313 (3d Cir. 1989) (emphasis added) (citation omitted). But the government has joined this appeal, rendering *McLaughlin* inapposite. And as this Court previously explained when granting the Little Sisters intervention as of right in this case, because the Little Sisters "seek the same relief as the federal government, they need not demonstrate Article III standing." *Pennsylvania v. President*, 888 F.3d 52, 57 n.2 (3d Cir. 2018).

If the States intend to relitigate the Little Sisters' right to intervene based on a recent injunction, they have not raised that argument in a

clear-enough fashion or cited relevant authority. *See John Wyeth & Bro. Ltd. v. CIGNA Int'l Corp.*, 119 F.3d 1070, 1076 n.6 (3d Cir. 1997) ("[A]rguments raised in passing . . . , but not squarely argued, are considered waived."). In any case, this Court's reasons for granting intervention, not least because the Little Sisters have an interest in preserving the regulation resulting from the Supreme Court's directive in *Zubik*, remain just as valid as they were last fall. *Pennsylvania*, 888 F.3d at 58.

**CONCLUSION**

The decisions below should be reversed.

Dated: April 8, 2019

Respectfully submitted,

/s/ *Mark Rienzi*

MARK L. RIENZI
LORI H. WINDHAM
ERIC C. RASSBACH
DIANA M. VERM
The Becket Fund for
Religious Liberty
1200 New Hampshire Ave. NW
Suite 700
Washington, DC 20036
(202) 955-0095
mrienzi@becketlaw.org

NICHOLAS M. CENTRELLA

Conrad O'Brien PC
1500 Market Street, Suite 3900
Philadelphia, PA 19102-2100
(215) 864-8098
ncentrella@conradobrien.com

*Counsel for Defendant-Intervenor-Appellant*

## CERTIFICATE OF BAR MEMBERSHIP

I hereby certify that I am a member in good standing of the bar of the United States Court of Appeals for the Third Circuit.

Dated: April 8, 2019

*/s/ Mark Rienzi*

MARK L. RIENZI
The Becket Fund for
Religious Liberty
1200 New Hampshire Ave. NW
Suite 700
Washington, DC 20036
(202) 955-0095
mrienzi@becketlaw.org

*Counsel for Defendant-Intervenor-Appellant*

## CERTIFICATE OF COMPLIANCE WITH FEDERAL RULE OF APPELLATE PROCEDURE 32 AND LOCAL RULE 31.1

I hereby certify that the following statements are true:

1. This brief complies with the type-volume limitation of 8,000 words set forth in this Court's order of April 3, 2019, because it contains 7,431 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).
2. This brief complies with the typeface and typestyle requirements of Federal Rule of Appellate Procedure 32(a)(5) and 32(a)(6). It has been prepared in a proportionally-spaced typeface using Microsoft Office Word 2016 in 14-point Century Schoolbook font.
3. This brief complies with the electronic filing requirements of Local Rule 31.1(c). The text of this electronic brief is identical to the text of the paper copies, and the latest version of Windows Defender has been run on the file containing the electronic version of this brief and no virus has been detected.

Executed this 8th day of April 2019.

*/s/ Mark Rienzi*
Mark Rienzi

## CERTIFICATE OF SERVICE

I certify that on the date indicated below, I filed the foregoing document with the Clerk of the Court, using the CM/ECF system, which will automatically send notification and a copy of the brief to the counsel of record for the parties. I further certify that all parties to this case are represented by counsel of record who are CM/ECF participants.

Executed this 8th day of April, 2019.

*/s/ Mark Rienzi*
Mark Rienzi